UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------

DAMON SANTIAGO,

                        Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

----------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-1464 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Damon Santiago, proceeding *pro se*, filed the above-captioned action seeking review pursuant to 42 U.S.C. § 405(g) of a final decision of Defendant Commissioner of Social Security denying his application for disability insurance benefits. Defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the Commissioner's decision is supported by substantial evidence. Plaintiff opposes Defendant's motion. The Court heard oral argument on September 17, 2014. For the reasons set forth below, Defendant's motion is denied, the Commissioner's decision is vacated and the Court remands the matter for further administrative proceedings.

**I.  Background**

Plaintiff filed an application for disability insurance benefits on July 5, 2012, based on a disability onset date of June 20, 2010. (R. 9.)[1] Plaintiff's application for disability benefits was denied on September 14, 2012. (*Id.*) Thereafter, Plaintiff requested a hearing, and a "video hearing" was held on January 7, 2013. (*Id.*) At the hearing, Plaintiff and Timothy P.

_____

[1]  Because the record as submitted by Defendant lacks full pagination, the Court cites to the Electronic Document Filing System (ECF) page number.

Janikowski, a vocational expert, testified. (*Id.*) On January 29, 2013, Administrative Law Judge Eric W. Borda ("ALJ") found that Plaintiff was not disabled. (*Id.* at 17.) On March 4, 2013, the Appeals Council denied review of the ALJ's decision. (*Id.* at 5–9.)

### a. Plaintiff's testimony

Plaintiff has an eleventh grade education and has not received his GED after five failed attempts. (*Id.* at 33.) Plaintiff is on public assistance for his housing and food needs. (*Id.* at 39.) Plaintiff alleges that he suffers from major depressive disorder, psychotic disorder and anxiety disorder. (*Id.* at 32.) In addition, Plaintiff complained of upper back and left elbow pain. (*Id.*)

On or about June 20, 2010, Plaintiff began to hear things, including people talking about him and threatening him. (*Id.* at 35.) Plaintiff testified that he saw a psychiatrist every week and a doctor every eight weeks. (*Id.* at 38.) Although medical treatment has helped "some," Plaintiff stated that he had problems being around others due to feeling uncomfortable, hearing things, crying and feeling very angry. (*Id.* at 38–39.) Because of his medication, Plaintiff is "always sleeping" and "groggy." (*Id.* at 40.) Some days Plaintiff does nothing else but sleep. (*Id.* at 42.) Plaintiff does not leave his home except to go to the doctor. (*Id.* at 39.)

### b. Plaintiff's work history

Plaintiff worked as a security guard at a homeless shelter from 1999 to 2003. (*Id.* at 33.) Plaintiff also worked as a "laborer" from 2003 to 2010. (*Id.* at 187.)

### c. Vocational expert's testimony

Timothy P. Janikowski, vocational expert, testified that Plaintiff could not presently perform his past work as a security guard, which is categorized as SVP-3.[2] (*Id.* at 44–46.) The

---

[2] "SVP stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job." *Urena-Perez v. Astrue*, No. 06-CV-2589, 2009 WL 1726217, at *20 n.43 (S.D.N.Y. Jan. 6, 2009) (quoting Jeffrey Scott Wolfe & Lisa B.

ALJ presented the following hypothetical to Janikowski:

> [A] person the claimant's age, education, and work experience who could do light work with frequent lift[ing] . . . , lift with pushing and pulling with his left arm is limited to frequent. He's . . . right-handed. He would be limited to simple, routine tasks, be off task five percent of the day in addition to regular scheduled breaks due to moderately impaired attention and concentration; can only work in a low-stress job, defined as having no fixed production quotas and no hazardous conditions; with only occasional decision making and only occasional changes in the work setting. He would need to have close supervision. In other words, a supervisor would have to check on him throughout the workday every probably every two hours, four times on each shift. He could have no interaction with the public and only occasional interaction with coworkers . . . .

(*Id.* at 45–46.) Janikowski stated that this hypothetical worker could perform "light exertional, uncontrolled work that's things oriented." (*Id.* at 46.) Janikowski identified a bench assembler, washer (by hand) and "inspector," all ranked as SVP-2, as examples. (*Id.* at 46–47.)

The ALJ then presented Janikowski with another hypothetical. (*Id.* at 47.) The hypothetical remained the same except that the worker would be off task up to 15 percent of his workday in addition to regularly scheduled breaks and have markedly impaired attention and concentration. (*Id.*) Janikowski stated that such a worker would not be able to meet the demands of the competitive labor market. (*Id.*) Janikowski also stated that employers would tolerate about one unscheduled absence per month, 12 absences over the course of a year. (*Id.* at 38.)

---

Proszek, *Social Security Disability and the Legal Profession* 163 (2002))), *report and recommendation adopted as modified*, No. 06-CV-2589, 2009 WL 1726212 (S.D.N.Y. June 18, 2009).

#### d. Medical evidence

##### i. Physical impairment

###### 1. Lincoln Medical and Mental Health Center reports

On April 29, 2010, Plaintiff visited the emergency room of Lincoln Medical and Mental Health Center after being punched in the face. (*Id.* at 251, 265.) He complained of right eyebrow pain and was categorized as non-urgent. (*Id.*) The treating physician noted decreased vision. (*Id.* at 255.) Plaintiff was given pain medication and sent to undergo a CT scan of his head and facial bones. (*Id.*) On April 30, 2010, Plaintiff's test results were "unremarkable" and the ophthalmologist was unable to identify an organic cause to Plaintiff's decreased vision. (*Id.* at 262.)

On June 19, 2010, Plaintiff visited the emergency room of Lincoln Medical and Mental Health Center after suffering an "intracranial injury." (*Id.* at 240.) He was bleeding from his scalp and complained of left shoulder and back pain. (*Id.*) His scalp wound was repaired and he was discharged with head injury instructions. (*Id.* at 242.) Scans were taken of Plaintiff's left shoulder and left elbow and demonstrated no evidence of fracture or dislocation. (*Id.* at 229.) Plaintiff's bones were in good alignment and his soft tissue was "unremarkable." (*Id.*)

On June 29, 2010, Plaintiff went to Lincoln Medical and Mental Health Center to have staples removed from his head and elbow. (*Id.* at 222–37.) His wound was healing well and he was told to return to the emergency room if his condition worsened. (*Id.* at 238.)

###### 2. Doctor Nadubeethi Jayaram

On October 7, 2011, Doctor Jayaram performed a consultative examination of Plaintiff's left elbow and noted that he could flex to 120 degrees easily but did have chronic medial epicondylitis of the left elbow. (*Id.* at 595.) Doctor Jayaram concluded that his condition was mild and he could perform activity as tolerated. (*Id.*)

### 3. Doctor Aurelio Salon

On August 30, 2012, Doctor Salon performed an internal medicine consultative examination of Plaintiff. (*Id.* at 585.) Doctor Salon noted that Plaintiff primarily complained of major depression with psychotic features, back pain, tendonitis of the left elbow, poor vision in the right eye and post-traumatic migraine headaches. (*Id.*) Doctor Salon noted that Plaintiff was then taking 2 mg of Risperidone daily, 20 mg of Citalopram daily and Motrin. (*Id.* at 586.) She also noted that Plaintiff could shower, bathe and dress by himself, used no assistive devices, needed no help getting on or off the examination table and could perform a full squat. (*Id.*) Doctor Salon concluded that there were no objective findings to support the fact Plaintiff would be restricted in his ability to sit or stand or in his capacity to climb, push, pull or carry heavy objects. (*Id.* at 588.)

### ii. Mental impairments

### 1. Federation Employment Guidance Service

On May 17, 2010, Plaintiff received a "biopyschosocial" assessment at Bronx Lebanon Hospital. (*Id.* at 350.) Plaintiff denied a history of mental health services and denied current "suicidal/homicidal ideation [and] auditory/visual hallucinations." (*Id.* at 359.) Plaintiff did state that he was depressed due to "false accusations made against him . . . ." (*Id.* at 360.) The assessment stated that further evaluation and treatment of Plaintiff's mental health condition would need to be done before a job disposition could be made. (*Id.* at 368.) On May 26, 2010, Plaintiff underwent a Federal Employment Guidance Service ("F.E.G.S.") "Phase II" psychiatry examination. (*Id.* at 398.) Plaintiff was diagnosed with cannabis and cocaine dependence. (*Id.* at 400–01.)

On June 9, 2011, in another "biopyschosocial" assessment, Plaintiff reported mental

health treatment as a child and auditory hallucinations within the past week. (*Id.* at 380.) The voices told him to kill people. (*Id.*) Kollie Saygbe, a F.E.G.S. social worker, found that Plaintiff's depression was "mild" but recommended him to a physician for further treatment. (*Id.* at 384.) Later that day, Doctor Zobidatte Moussa evaluated Plaintiff and referred him to another physician for a Phase II examination. (*Id.* at 392.) Doctor Moussa noted that Plaintiff was suffering from frequent auditory hallucinations telling him to arm himself with pistols. (*Id.*) Plaintiff also believed that he was being spied on by others and that people were spreading rumors that he had HIV. (*Id.* at 395.) After Plaintiff's Phase II evaluation, Doctor Harvey Barash determined that Plaintiff suffered from schizophrenic disorders and unspecified drug abuse and that he had functional limitations due to his disorders that would last for at least 12 months, thereby making him unable to work. (*Id.* at 404.) Doctor Barash found Plaintiff to be a chronic psychotic, in addition, Doctor Barash found that Plaintiff had reduced tolerance for stress and an inability to adhere to a regular work schedule. (*Id.*) It appears that Doctor Barash was so concerned that he called 911 to transport Plaintiff to a hospital for further evaluation. (*Id.*)

On July 5, 2011, a "Wellness Plan" document indicated that Plaintiff would be treated for schizophrenia and that Plaintiff informed his case manager that his goal was to "stabilize with his medication in order to focus on becoming self sufficient." (*Id.* at 534.) On January 18, 2012, John Dzwonar, Plaintiff's treating social worker, completed a screening of Plaintiff. (*Id.* at 583.) He noted Plaintiff's long history of depression, anxiety and paranoia. (*Id.*) Plaintiff received a GAF[3] score of 52 indicating moderate symptoms or moderate difficulty in social, occupational or

---

[3] "The GAF is a scale [formerly] promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n,

school functioning.  (*Id.*); *see also Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (noting

that this "moderate" category includes scores between 51 and 60 (quoting Am. Psychiatric

Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000))).  On October

1, 2011, Plaintiff received a letter confirming that he was determined to be temporarily unable to

work and was being referred for treatment.  (*Id.* at 406.)

On March 26, 2012, Plaintiff's "Wellness Plan" was extended due to his ongoing

schizophrenia.  (*Id.* at 550.)  Doctor Kevin J. Kenny, Plaintiff's treating psychiatrist, prescribed

Risperidone, for the management of Plaintiff's psychotic disorders, and Citalopram, for the

treatment of depression.  (*Id.* at 335–36, 550.)  Plaintiff met with Doctor Kenny at least five

times from January 2012 to July 2012.  (*Id.* at 53, 550.)

On May 2, 2012, Dzwonar confirmed that Plaintiff had been in weekly therapy and

monthly medication management at Manhattan Counseling Center since January 1, 2012.  (*Id.*

at 521.)  Dzwonar diagnosed Plaintiff with "major depression recurrent."  (*Id.*)

On June 7, 2012, Doctor Kenny diagnosed Plaintiff with major depressive disorder.  (*Id.*

at 463.)  Doctor Kenny noted that Plaintiff has periods of stability but that his condition is

chronic.  (*Id.* at 464.)  Doctor Kenny concluded that Plaintiff is unable to work for at least 12

months.  (*Id.*)  On June 27, 2012, Plaintiff received a letter from F.E.G.S., which stated that he

was unable to work and may be eligible for federal disability benefits and should report to a

certain address to receive help filling out a disability benefits application.  (*Id.* at 599.)

On July 19, 2012, Doctor Kenny reiterated his diagnosis of "major depression recurrent."

(*Id.* at 584.)  Doctor Kenny found Plaintiff's condition to be chronic but manageable.  (*Id.*)

---

*Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)).  As discussed *infra*,
*see* Part II.c.iii, the American Psychiatric Association has abandoned the GAF scale.

Doctor Kenny opined that Plaintiff had a GAF score of 52 and was "markedly limited" in the

following capacities: (1) remembering detailed instructions, (2) carrying out detailed

instructions, (3) maintaining attention/concentration, (4) maintaining a regular work schedule,

(5) sustaining ordinary routine without supervision, (6) working in coordination with others

without distractions, (7) making simple work related decisions, (8) completing a normal workday

without unreasonable rest periods, (9) interacting with others, (10) asking simple questions,

(11) accepting instructions and responding to criticism appropriately, (12) getting along with

others, (13) maintaining socially appropriate behavior, and (14) responding appropriately to

changes in work.  (*Id.* at 584–85.)  In support of his conclusions, Doctor Kenny noted that

Plaintiff had poor memory, mood disturbances, emotional lability,[4] difficulty thinking or

concentrating, hostility and irritability, social withdrawal or isolation, and mood swings triggered

by "being around people too much."  (*Id.* at 588.)

Doctor Kenny also found that Plaintiff was "moderately limited" in the following:

(1) being aware of normal hazards and taking appropriate precautions, (2) traveling to unfamiliar

places or using public transportation, (3) setting realistic goals or making plans independently,

(4) remembering locations and work-like procedures, (5) understanding and remembering one or

two step instructions, and (6) carrying out simple one or two step instructions.  (*Id.* at 589.)

### 2.    Doctor Haruyo Fujiwaki

On August 30, 2012, Doctor Fujiwaki performed a consultative psychiatric examination

of Plaintiff.  (*Id.* at 589.)  Doctor Fujiwaki noted that Plaintiff reported difficulty falling asleep,

---

[4]  "'Emotional lability,'" also referred to as 'mood lability,' is defined as '[e]xcessive
emotional reactivity associated with frequent changes or swings in emotions and mood.'"
*Bonneau v. Astrue*, No. 13-CV-26, 2014 WL 31301, at *5 n.1 (D. Vt. Jan. 3, 2014) (quoting F.A.
Davis Co., *Taber's Cyclopedic Medical Dictionary* (2011)).

social withdrawal, crying spells, irritability and anger.  (*Id.*)  Plaintiff also reported hearing

voices.  (*Id.*)  Doctor Fujiwaki concluded that Plaintiff could follow and understand simple

directions and instructions, could maintain attention, concentration and a regular schedule, and

could perform complex tasks with supervision.  (*Id.* at 591.)

### 3.  **Doctor R. Noble, PhD**[5]

On September 13, 2012, Doctor R. Noble, PhD, a state agency psychological consultant,

reviewed the record and concluded that Plaintiff did not meet the criteria of Listings 12.03

(schizophrenic, paranoid and other psychotic disorders), 12.04 (affective disorders), 12.06

(anxiety-related disorders ) or 12.09 (substance addiction disorders).  (*Id.* at 54, 70.)  Doctor

Noble indicated that he gave "great weight" to the findings of Doctor Kenny, Doctor Salon and

Doctor Fujiwaki.  (*Id.* at 55.)

### 4.  **New York Presbyterian Hospital**

On June 9, 2011, Plaintiff was admitted as an emergency-status patient to New York

Presbyterian Hospital pursuant to New York Mental Hygiene Law.  (*Id.* at 288.)  Plaintiff was

suffering from paranoid delusions and was deemed a danger to himself and others.  (*Id.*)

Plaintiff reported that his telephone was tapped and that people were accusing him of spreading

diseases.  (*Id.* at 289.)  On June 11, 2011, Plaintiff hand wrote a note stating that he did not

belong at the hospital, that he has his own apartment and no mental problems.  (*Id.* at 293.)

Plaintiff "retracted" this letter upon notice that he would be released on June 17, 2011.  (*Id.*

at 294.)

On June 13, 2011, Plaintiff's commitment became involuntary.  (*Id.* at 287.)  In relation

to his involuntary commitment, Doctor Anna L. Dickerman examined Plaintiff.  (*Id.* at 292.)

---

[5]  The Court is unable to identify Doctor Noble's full name from the record.

Doctor Dickerman noted that Plaintiff is "likely [a] chronic psychotic . . . ." (*Id.*) On June 21, 2011, Doctor Maureen Martino diagnosed Plaintiff with a cocaine dependency along with secondary diagnosis of drug psychosis with hallucination, cannabis dependency and personality disorders. (*Id.* at 302.)

### 5. Richmond University Medical Center

The record suggests that Plaintiff received inpatient treatment at Richmond University Medical Center for mental health.[6] (*Id.* at 468, 569.) However, the record does not contain any primary documents attesting to this hospitalization.

On August 15, 2011, Plaintiff was examined by Wendy Wullbrandt, a licensed social worker, of the Behavior Health Service Division of the Richmond University Medical Center. (*Id.* at 310–11.) Upon assessment, Plaintiff denied auditory hallucinations, denied believing that people were spying on him, and denied auditory hallucinations urging him to arm himself with pistols. (*Id.* at 311.) Although Plaintiff denied delusions, Wullbrandt noted that he did exhibit some paranoid ideation. (*Id.*) Plaintiff felt hopeless about his unemployment and lack of income but denied suicidal/homicidal ideation. (*Id.*) Wullbrandt noted that Plaintiff's insight and judgment appeared "good to fair." (*Id.* at 314.) She encouraged Plaintiff to attend an out-patient program for mental health and substance abuse but Plaintiff refused. (*Id.* at 315.) Wullbrandth opined that Plaintiff was underreporting his symptoms due to a desire to find employment. (*Id.*)

---

[6] Plaintiff's "Adult Disability Report" indicates that Plaintiff was hospitalized at Richmond University Medical Center. (R. 468.) The Adult Disability Report also indicates that Plaintiff "could not elaborate further on [the] reason for hospitalization but claimant has copies of records from hospitalization." (*Id.*) The same report notes that Plaintiff was hospitalized from July 29, 2011, to August 15, 2011. (*Id.*) Doctor Fujiwaki's psychiatric evaluation also indicates that Plaintiff was hospitalized at "Richmond University Hospital" in July 2011. (*Id.* at 569.) In addition, the record includes an unsigned and undated "Disability Report - Adult" form, which states that Plaintiff could not recall being hospitalized for two weeks at Richmond University Hospital in 2011. (*Id.* at 169–77.)

### e. Non-medical evidence

#### i. Function Report

On July 5, 2012, Edinam Klu, Plaintiff's SSI case manager, completed a "function report – adult-third party" form. (*Id.* at 158.) Klu reported that Plaintiff had no problem with personal care, lives alone, prepares his own meals daily, pays bills and handles a savings account and checkbook. (*Id.* at 158–161.) Klu noted that Plaintiff has days where his depression causes him to feel like he is not able to do anything at all, that Plaintiff does not travel unless he needs to buy food or household items, but that he once used to participate in activities like socializing with family and friends. (*Id.* at 160–62.) Klu further noted that Plaintiff has problems getting along with others but that he is able to get along well with authority figures. (*Id.* at 163–64.) Klu also reported that Plaintiff appeared anxious at certain times during the interview process. (*Id.* at 163.) On August 8, 2012, Klu completed another form reiterating the above information. (*Id.* at 178–90.)

### f. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required, and more fully discussed below. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 20, 2010. (*Id.* at 11.) Second, the ALJ determined that Plaintiff has the following severe impairments: "left elbow tendonitis; obesity; depressive, personality and psychotic disorders; and cannabis and cocaine dependence." (*Id.*) Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in Appendix 1 of the regulations. (*Id.* at 11–12.) The ALJ "paid particular attention to" Listing 1.02 for major dysfunction of a joint, Listing 12.03 for psychotic disorders, Listing 12.04 for affective disorders, Listing 12.08 for personality disorders

and Listing 12.09 for substance addiction disorders.  (*Id.*)  With respect to the mental disorders listings, the ALJ found that Plaintiff only suffered from a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation.[7]  (*Id.* at 12.)  The ALJ also found that Plaintiff did not have a residual disease process barring an increase in mental demands or have an inability to function outside a highly supporting living environment.  (*Id.*)

Fourth, the ALJ found that Plaintiff could not perform past relevant work as a security guard.  (*Id.* at 16.)  The ALJ gave Plaintiff the following residual functional capacity "RFC" assessment:

> [Plaintiff] has the residual functional capacity to perform light work with frequent pushing or pulling with his left arm; work limited to simple and routine tasks; work in a low stress job defined as having no fixed production quotas, no hazardous conditions, only occasional decision making and only occasional changes in the work setting; work with close supervision, defined as having a supervisor checking in on him four times per day; no interaction with the public; and only occasional interaction with co-workers.

(*Id.* (citations omitted).)  The ALJ also recognized that Plaintiff's obesity and left arm limitations render Plaintiff capable of only performing a range of light exertion.  (*Id.* at 15.)  The ALJ, while noting that Plaintiff suffers from mental disorders and substance addiction, concluded that Plaintiff's mental condition can be stabilized with treatment and medication.  (*Id.*)  Finally, the ALJ determined that Plaintiff could perform a significant number of jobs in the national

---

[7]  "*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5 (quoting United States Social Security Administration, Disability Evaluation Under Social Security § 12.00 (June 2006), *available at* http://www.ssa.gov/disability/professionals/bluebook/12.00–MentalDisorders–Adult.htm).

economy, and concluded that Plaintiff was not disabled.  (*Id.* at 17.)

## II. Discussion

### a. Standard of Review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  Substantial evidence requires "more than a mere scintilla." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, --- F. Supp. 2d ---, ---, 2014 WL 997553, at *13 (E.D.N.Y. Mar. 14, 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act (the "Act"). To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c. Analysis

Defendant moves for judgment on the pleadings, claiming that the Commissioner's decision is supported by substantial evidence and should be affirmed. (Def. Mem. 1.) Plaintiff opposes the Defendant's motion and argues that he is disabled due to "major depression psychotic disorder." (Pl. Opp'n Ltr. 1.) Because Plaintiff's treating physician, Doctor Kenny, diagnosed Plaintiff with major depressive disorder and found that Plaintiff was disabled as a result of said disorder, the Court understands Plaintiff to argue that the ALJ failed to properly weigh the evidence. For the reasons set forth below, the Court agrees with Plaintiff.

### i. Treating physician rule and duty to develop the record

"A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). But a treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (discussing treating physician rule). A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical

treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors before determining how much weight to give a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362 F.3d at 32 (discussing the factors). The regulations require that the ALJ set forth the reasons for the weight he or she assigns to the treating physician's opinion. *Halloran*, 362 F.3d at 32. The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33.

Before determining whether the Commissioner's decision is supported by substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Act." *Moran*, 569 F.3d at 112 (alterations omitted) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record.").  The ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give the treating physician's opinion.  *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. Mar. 22, 2013 (remanding for failure to develop the record); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history."); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . .  Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))).  "Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is 'all the more important.'" *Rocchio v. Astrue*, No. 08-CV-3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (citation omitted), *report and recommendation adopted*, No. 08-CV-3796, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011).  An ALJ's "failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case."  *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) (citing *Moran*, 569 F.3d at 114–15), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).  However, "where there are no obvious gaps in the administrative record, and where the

ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Petrie*, 412 F. App'x. at 406 (quoting *Rosa*, 168 F.3d at 79 n.5).

### ii. The ALJ properly addressed Plaintiff's physical limitations

Plaintiff complained of back and elbow pain, and the ALJ assessed Plaintiff's medical records under Listing 12.02 (major dysfunction of a joint). The ALJ found that Plaintiff suffers from left elbow tendonitis. (R. 15.) However, the ALJ went on to find that Plaintiff's left elbow tendonitis did not prevent him from performing a range of light work. (*Id.* at 5.) As an initial matter, the Court notes that Plaintiff does not seem to be appealing the ALJ's decision as to his physical limitations as Plaintiff's opposition letter only mentions "major depression psychotic disorder" as the basis of his disability claim. (Pl. Opp'n Ltr. 1.) Moreoever, the ALJ's conclusion was supported by Plaintiff's own testimony that he had no limitations on his ability to stand or walk, (R. 41), Plaintiff's submission that he prepares his own meals, (*id.* at 180), and representations from Plaintiff's SSI case manager that he has no problem performing daily activities such as bathing, preparing meals and dressing himself, (*id.* at 159–60). The only medical evidence presented confirms that Plaintiff has left elbow tendonitis and only "mild stiffness." (*Id.* at 575.) Nothing in the record, including Plaintiff's own testimony, indicates that his elbow impairment restricts Plaintiff's ability to perform light work. The Court also notes that at oral argument, Plaintiff did not assert any physical impairment as the basis for disability benefits. Therefore, the ALJ's decision regarding Plaintiff's physical limitations was supported by substantial evidence.

### iii.  The ALJ failed to properly address Plaintiff's mental disorders

Before assessing whether the ALJ properly weighed the evidence within the record regarding Plaintiff's mental limitations, it is helpful to consider the regulatory requirements at issue.  The social security regulations provide nine diagnostic listings of mental disorders: "Organic mental disorders (12.02); schizophrenic, paranoid and other psychotic disorders (12.03); affective disorders (12.04); intellectual disability (12.05); anxiety-related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders (12.09); and autistic disorder and other pervasive developmental disorders (12.10)."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A).  Plaintiff claims disability based on "major depression, psychotic disorders" and "major depression with psychotic features."  (R. 66.)  The ALJ assessed the medical findings in the record pursuant to Listing 12.03 (paranoid and other psychotic disorders), Listing 12.04 (affective disorders), Listing 12.08 (personality disorders) and Listing 12.09 (substance addiction disorders).  (*Id.* at 16.)

In order to meet the requirements of any of the listings identified by the ALJ, Plaintiff must satisfy, *inter alia*, "paragraph B" criteria, which address "impairment-related functional limitations that are incompatible with the ability to do any gainful activity."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A).  To satisfy paragraph B, under the aforementioned listings, Plaintiff must show at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.03(B), 12.04(B), 12.08(B).

If Plaintiff fails to satisfy the paragraph B criteria, he may still meet the requirements of Listing 12.03 (paranoid and other psychotic disorders) and Listing 12.04 (affective disorders) if he can meet the paragraph C criteria.[8] To satisfy the requirements of paragraph C, under Listings 12.03 and 12.04, Plaintiff must show a:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.03(C), 12.04(C).[9]

With respect to the functional limitations enumerated in paragraph B, the ALJ found that Plaintiff had "mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation . . . ." (R. 16.) The ALJ's conclusion was inconsistent with the July 19, 2012 medical findings of Plaintiff's treating physician Doctor Kenny, (*see id.* at 584–

---

[8] Although all mental disorder listings under the social security regulations contain the same paragraph B criteria, only Listings 12.02, 12.03, 12.04 and 12.06 contain the alternative functional criteria of paragraph C.

[9] Listing 12.09, for substance addiction disorders, is satisfied whenever behavior or physical damage resulting from substance abuse satisfies the requirements of Listings 5.00, 5.05, 5.08, 11.02, 11.03, 11.14, 12.02, 12.04, 12.06 or 12.08. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09.

585 (finding that Plaintiff had "*markedly* limited" ability to maintain concentration, to interact with others and to maintain socially appropriate behavior (emphasis added))), and the ALJ accordingly gave Doctor Kenny's opinions "little weight," (*id.* at 19).

An ALJ may give less than controlling weight to an opinion from a treating physician, but before doing so, the ALJ must apply the statutory factors listed in 20 C.F.R. § 404.1527(c). *See* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider *all of the following factors* in deciding the weight we give to any medical opinion." (emphasis added)). The factors to be considered under § 404.1527(c) are (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factor which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)–(6); *Santiago v. Comm'r of Soc. Sec.*, No. 13-CV-3951, 2014 WL 3819304, at *17 (S.D.N.Y. Aug. 4, 2014) (noting that an ALJ must evaluate these factors if he or she wishes "to discredit the opinion of a treating physician"); *Saldin v. Colvin*, No. 13-CV-4634, 2014 WL 3828227, at *12 (E.D.N.Y. Aug. 4, 2014) (identifying the factors).

The ALJ assigned little weight to Doctor Kenny's July 19, 2012 medical findings concerning Plaintiff's functional limitations because Doctor Kenny gave Plaintiff a moderate GAF score and found that Plaintiff's condition was "manageable." (*Id.* at 19.) In doing so, the ALJ ignored Dr. Kenny's findings that Plaintiff had "markedly" limited ability to maintain concentration, to interact with others and to maintain socially appropriate behavior. The ALJ's explanation is insufficient. First, the Court notes that the GAF scale, previously published in the Diagnostic and Statistical Manual of Mental Disorders, has been abandoned by the American Psychiatric Association. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions about DSM-5*

*Implementation- For Clinicians* (last visited Aug. 7, 2014) ("We do not believe that a single score from a global assessment, such as the GAF, conveys information to adequately assess each of these components, which are likely to vary independently over time."). Even assuming that GAF scores remain valid, a GAF score of 52 is at the low end of the "moderate" range. *See Kohler*, 546 F.3d at 262 n.1 (noting that this "moderate" category includes scores between 51 and 60 (citation omitted)). Doctor Kenny, presumably, understood a GAF score of 52 to be consistent with Plaintiff's "markedly limited" functional capacity. *Cf. Quinn v. Astrue*, No. 10-CV-1415, 2011 WL 1883848, at *7 (W.D. Pa. May 17, 2011) (noting that "a physician's GAF score is 'fairly understood to convey' his belief regarding a patient's level of impairment or ability to function" (quoting *Gilroy v. Astrue*, 351 F. App'x 714, 716 (3d Cir. 2009))). Any discrepancy between Dr. Kenny's GAF score and functional capacity findings should have prompted the ALJ to develop the record, rather than to disregard Doctor Kenny's opinion that Plaintiff had markedly limited functional capacity to maintain attention/concentration and interact with others. *See Walker v. Colvin*, No. 12-CV-116, 2013 WL 5487443 (W.D.N.Y. Sept. 30, 2013) (finding that inconsistency within a treating physician's opinions "begs for clarification" (citing C.F.R. § 404.1512(e))); *see also Rosa*, 168 F.3d at 79 ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998))); *Cedeno v. Comm'r of Soc. Sec.*, 315 F. App'x 352, 353 (2d Cir. 2009) (Sotomayor, J.) (remanding for further adjudicative proceedings due to the ALJ's failure to seek additional evidence from a treating physician whose opinions the ALJ deemed "conclusory and not supported by clinical and laboratory diagnostic tests").

The same reasoning applies to Doctor Kenny's conclusion that Plaintiff's condition was "manageable." The ALJ understood Doctor Kenny's finding of manageability to undercut his findings of "marked mental limitations." (R. 19.) However, manageable could refer to Plaintiff's ability to avoid endangering himself and others while still being unable to perform any gainful activity on a daily basis. The ALJ's duty to develop the record is especially important in the context of a mental impairment claim because the SSA regulations require that the ALJ's decision discuss "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a. At oral argument, Defendant claimed that the record was complete and that the ALJ properly resolved any inconsistencies without having to recontact Dr. Kenny. Here, however, the record was not complete for two primary reasons.

First, the Court finds that Dr. Kenny's medical opinion was not "complete and detailed" enough to allow the ALJ to make a proper determination. *See* 20 C.F.R. § 404.1513(e); *Cherico v. Colvin*, No. 12-CV-5734, 2014 WL 3939036, at *22 (S.D.N.Y. Aug. 7, 2014) ("The ALJ must therefore seek additional evidence or clarification when . . . the report does not contain all the necessary information, or [it] does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" (alteration in original) (quoting *Bonet v. Astrue*, No. 05-CV-2970, 2008 WL 4058705, at *18 (S.D.N.Y. Aug. 22, 2008))). Dr. Kenny's opinion directly spoke to functional limitations that would, if credited, satisfy the paragraph B criteria of Listings 12.03, 12.04, 12.08 and 12.09. Although the ALJ suggested that Dr. Kenny's opinion was internally inconsistent, the Court finds that it only lacked necessary information to more explicitly identify how Plaintiff could have markedly limited functional capacity and a GAF score of 52 and a "manageable" condition.

Second, the ALJ failed to resolve a rather apparent ambiguity. Plaintiff testified that he was hospitalized twice. (R. 35.) The ALJ and Plaintiff also discussed the dates of these alleged hospitalizations. (*Id.* at 35–37.) Several secondary documents in the record also mention two hospitalizations, discussed *supra* footnote 7. Yet, the ALJ decision only discusses Plaintiff's involuntary commitment at New York Presbyterian Hospital. (*Id.* at 18.) Because two hospitalizations are discussed in several documents, in addition to Plaintiff's own testimony, it was the ALJ's duty to develop the record and confirm or deny this second hospitalization — this is especially true where Plaintiff proceeded *pro se*. *See Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) ("The ALJ must 'adequately protect a pro se claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered' and by 'scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts.'" (alterations in original) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990))).

In addition to the ALJ's failure to develop the record, it is not clear that the ALJ assessed all the statutory factors of 20 C.F.R. § 404.1527(c) before assigning Doctor Kenny's opinion little weight. There is no mention of the nature or term of Doctor Kenny's relationship with Plaintiff or the consistency of Doctor Kenny's opinions with other parts of the record, notably, Plaintiff's own testimony, Plaintiff's involuntary commitment to New York Presbyterian Hospital and the opinions of Doctor Moussa and Doctor Barash, discussed *infra* Part II.c.iv. *See Intonato v. Colvin,* No. 13-CV-3426, 2014 WL 3893288, at *13–15 (S.D.N.Y. Aug. 7, 2014) (remanding, in part, due to the ALJ's failure "to consider and comprehensively set forth the factors needed to guide his decision to accord a treating physician less than controlling weight"); *Coscia v. Astrue*, No. 08-CV-3042, 2010 WL 3924691, at *8 (E.D.N.Y. Sept. 29, 2010) ("[T]he ALJ declined to accord [the plaintiff's treating physician's] assessment controlling, or even

'great,' weight.  In making this decision, the ALJ did not take into consideration two of the relevant factors . . . .  As consideration of these factors is mandatory, the ALJ's lapse mandates remand." (citations omitted)); *see also Orr v. Comm'r of Soc. Sec.*, No. 13-CV-3967, 2014 WL 4291829, at *8 (S.D.N.Y. Aug. 26, 2014) ("Given that consideration of these factors is mandatory, the Court cannot see how the ALJ could have properly applied the treating physician rule given the state of the record."); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507 (S.D.N.Y. 2014) ("The ALJ's decision erred by failing to explicitly consider several required factors, including . . . the frequency, length, nature, and extent of treatment.").  Even absent a duty to develop the record with respect to Dr. Kenny's opinion, the Court is not confident that the ALJ properly adhered to the treating physician rule, and this error constitutes an independent ground for remand.  Upon remand, after an examination of a fully developed record, if the ALJ declines to give Doctor Kenny's medical opinions controlling weight, the ALJ should identify and discuss the factors set forth in 20 C.F.R. § 404.1527(c).

### iv.  Non-treating physicians

The Court also notes that the ALJ is required to evaluate and weigh the medical findings of non-treating physicians.  *See* 20 C.F.R. § 416.927(c) ("we will evaluate every medical opinion we receive . . . ."); 20 C.F.R. 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . , as the administrative law judge must do for any opinions from treating sources, *nontreating sources*, and other nonexamining sources who do not work for us." (emphasis added)).

Here, on June 9, 2011, Plaintiff was evaluated by two doctors, Doctor Moussa and Doctor Barash, who both found him to be suffering from schizophrenic disorders.  (R. 395, 404.)  The

ALJ's decision makes no mention of Doctor Moussa or Doctor Barash. Furthermore, although the ALJ did identify Plaintiff's June 9, 2011 F.E.G.S. records, he erroneously stated that Plaintiff's schizophrenic disorders were diagnosed as "stable." (*Id.* at 18.) Plaintiff's June 9, 2011 F.E.G.S. records, from Doctor Moussa and Doctor Barash, state in no uncertain terms, that Plaintiff's schizophrenic disorders and schizoaffective disorders were *unstable*. (*Id.* at 395, 404.) The results of Plaintiff's Phase II psychiatric evaluation was succinctly stated as follows: "Substantial Functional Limitations to Employment Due to Medical Conditions That Will Last For At Least 12 Months and Make The Individual Unable To Work." (*Id.* at 391.)

The ALJ seems to have focused solely on the June 9, 2011 findings of the F.E.G.S. social worker, (*id.* at 384), instead of the evaluations by the physicians performed later the same day, (*id.* at 395, 404). The ALJ's failure to discuss these findings would be problematic in its own right, however, here, it appears that the ALJ misread the findings in addition to ignoring their conclusions in support of Plaintiff's claim. This error requires remand.[10] *See Lewis v. Astrue*, NO. 11-CV-7538, 2013 WL 5834466, at *27–30 (S.D.N.Y. Oct. 30, 2013) (finding that the ALJ committed "legal error" by failing to consider medical records "that may have added to, or been in tension with," the ALJ's analysis); *Santiago*, 2014 WL 3819304, at *19 (finding "the ALJ's decision to disregard the opinions of the F.E.G.S. physicians, without *any* explanation" to be "troubling" and holding that the ALJ's error prevented the Court from "determin[ing] whether [plaintiff] was afforded a full and fair hearing").

---

[10] The Court notes that while under involuntary commitment, Doctor Dickerman of New York Presbyterian Hospital noted that Plaintiff was likely a chronic psychotic. (R. 292.) The ALJ failed to address this finding as well.

### III.  Conclusion

For the foregoing reasons, the Court finds that the ALJ erred in failing to develop the record and properly weigh the evidence with respect to Plaintiff's mental impairments. Therefore, Defendant's motion for judgment on the pleadings is denied.  The Commissioner's decision is vacated and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated:  September 25, 2014
        Brooklyn, New York